| | |
|---|---|
| IN THE MATTER OF ARBITRATION ) | ARBITRATION AWARD |
| ) | |
| between ) | |
| ) | Discharge of Randy Witherow |
| Tecnocap, LLC ) | |
| ) | FMCS No. 160518-55258-6 |
| and ) | |
| ) | |
| ) | |
| Graphic Communications Conference/ ) | JOHN M. FELICE |
| International Brotherhood of Teamsters ) | Arbitrator |
| Local 24M ) | |
| ) | |

## SUBJECT: DISCHARGE

Hearing held in Pittsburgh, PA
July 13, 2016

## APPEARANCES

For the Company

Bradley K. Shafer, Esq.

For the Union

Ernest B. Orsatti, Esq.


EXHIBIT 21

## NATURE OF THE GRIEVANCE

The undersigned Arbitrator was selected by the parties to hear and decide a matter in dispute between Graphic Communications Conference/International Brotherhood of Teamsters Local 24M, hereinafter referred to as "Union", and Tecnocap, LLC, hereinafter referred to as "Company".

The dispute is properly before the Arbitrator in accordance with the Collective Bargaining Agreement (CBA) between the parties.

On July 13, 2016, a hearing was held in Pittsburgh, Pennsylvania, at which time a full opportunity to introduce evidence and examine and cross-examine witnesses was afforded to both parties. Post hearing briefs were field by the parties on August 10, 2016.

## ISSUE

Was the Grievant discharged for just cause? If not, what shall be the remedy?

## BACKGROUND

On March 8, 2016, Randy Witherow, (the "Grievant"), was discharged for violating a last chance agreement dated October 8, 2015. Thereupon, the Union filed a grievance on behalf of the Grievant on March 15, 2016 protesting the discharge as not being for just cause. When the parties were unable to resolve the dispute by means of the grievance procedure, they submitted the matter to the undersigned arbitrator for final and binding disposition.

## PERTINENT CONTRACT PROVISIONS

### ARTICLE XII PROMOTION, LAYOFF AND DISCHARGE

Section 5: "No employee may be disciplined or discharged except for just cause..."

1

## CONTENTIONS OF THE PARTIES

The Union contends that the discharge of the Grievant was not for just cause. Accordingly, the Union requests that the Grievant be reinstated and made whole.

The Company contends that it properly exercised its right to discharge the Grievant relying upon a last chance agreement based on the Grievant being absent from work on March 8, 2106. It asserts that sufficient grounds for discharge were established by virtue of the Grievant's overall absentee record.

## DISCUSSION AND FINDINGS

The Company has an attendance policy ("Policy") which was introduced into the record. The Policy is construed and interpreted by the Company as a "no-fault" policy. The overall purpose of the policy is to encourage regular attendance and punctuality for operational efficiency.

The Policy establishes a progressive discipline system based on an accumulation of points for specific occurrences of absences or tardiness. Unreported absences, referred to by the Company as a "no call, no show", results in 3 points. A reported absence is 1 point. Tardiness is half a point. After reaching 6 points, a verbal warning is issued. 8 points result in a written warning. 10 points result in a three day suspension, 12 points result in a suspension pending termination. After 30 days, if an employee accumulates no points, he has one point deducted from his overall total.

A review of the evidence reveals that since 2007, the Grievant's attendance points have ranked between a written warning (8 points) and suspension (10 points) leading up to the Grievant's termination. The Grievant received a written warning with points on February 6, 2015. He received another written warning with points on April 20, 2015. He then received a notice of a three day suspension for 10 points on September 2, 2015 which he served on September 15, 16, and 17. On September 25, the Grievant received 3 points for a "no call, no show" which placed him at 13 points which is above the 12 point suspension pending termination threshold. Thereupon, the Grievant was terminated on September 29, 2015.

On October 8, 2015, the Company and the Grievant entered into a last chance agreement. The Agreement provided, inter alia, that the Grievant would be placed on an eight month probationary period during which time he was not to miss any work without first obtaining prior approval of his supervisor or having an excused absence approved by both the Plant Manager and the Director of Human Resources.

On March 8, 2016, while traveling to work, the Grievant's car broke down due to an overheated catalytic converter. The Grievant and his passenger, co-worker Ricky Laughlin, both called the company to advise them of the circumstances and stated they would not be coming to work. Laughlin testified that he was aware that he would be late for work and would get half a point but he decided to take the day off and received one point. He testified that he called his daughter to pick them up and he also offered to have his daughter drive the Grievant to work because he knew the Grievant was on a last chance agreement. The Grievant declined the offer because he wanted to get his car home and try to fix it as quickly as possible since it was on the side of the highway.

It was undisputed that the Grievant had been carpooling for three years with co-worker Laughlin. It is also undisputed that the Grievant lives 55 miles from his place of work and that he and Laughlin generally met at Route 344 Tire and Tow Truck Company. They parked their cars there and drove to work together. On March 8, 2016, they were 20 miles along their way to work when the Grievant's car broke down.

The Grievant stated he could have made it to work on March 8, 2016 but that would have required him to abandon his car on the side of the highway. He further testified that he was concerned that his car would be considered abandoned and would be towed by the State Police. He testified that he was concerned that by not immediately repairing his vehicle he would not have a way to get to work the following day. Further, he did not know how long it would take to repair the vehicle. The Grievant testified unrebutted that he could not afford to have the car professionally repaired. The Grievant repaired the vehicle by removing the catalytic converter, and purchasing some sensors.

It is undisputed that the company immediately decided to terminate the Grievant as soon as they learned he was absent from work on March 8, 2106 without first conducting

3

any investigation. In fact, the Company did not begin any investigation until after the demand for arbitration was made.

There is inconsistency in the Company's testimony involving the lack of documentation to prove the existence of the vehicle malfunction. The Grievant testified he had no documentation since he repaired his own vehicle. The issue, regarding lack of paperwork, arose during discussions with the Union in a grievance meeting after the Grievant's termination. The Company argues that the Grievant was not terminated because he failed to produce documentation verifying the breakdown of his vehicle. However, in an email dated April 15, 2016 from Darrick Doty to Union President Chris Lang which was introduced into evidence militates against this position. In his email, Doty states: "The Company feels that the termination was justified due to not providing appropriate documentation for his absence."

In response to that email, the Company was notified by the Union that Laughlin was a witness who could have verified that the breakdown occurred. It was not until after the demand for arbitration was made that Laughlin was interviewed by the Company. He should have been interviewed prior to the discharge of the Grievant, to ascertain any facts surrounding the breakdown.

In the instant case, the Company considers the last chance agreement to be self-executing and interprets its absentee policy as providing an absolute right to discharge based on employees who accumulate a specific number of points, notwithstanding the reasons for the absences.

The fundamental principle underlying any discharge of an employee is that management must have just cause for imposing the discharge. The Company in the instant case appears to be applying its Policy in a punitive fashion. Simply because an employee is absent a specific number of times and accumulates a certain number of points does not, ipso facto, provide for automatic discharge. No policy can vitiate the right of the Union to challenge whether the cause asserted for discharge is just under the CBA. To recognize such a policy through arbitration would be unreasonable since it would contravene the express intent and purpose of establishing and specifying cause for discharge under a labor agreement.

4

If this arbitrator were to accept the premise that the right to automatically discharge employees who receive a specific number of points, without considering the circumstances surrounding the absence, would render the grievance procedure useless and the right of a discharged employee under such circumstances to resort to the grievance procedure would be meaningless.

The issue in the instant case is not novel. In fact, the issue of rules unilaterally established by employers has been addressed by a significant number of arbitrators particularly in cases involving absenteeism. In one leading case, the arbitrator found that "rules unilaterally established by the Company providing for suspension and discharge of employees, who accumulate a specific number of absences regardless of the circumstances are invalid because they conflict with contract clauses permitting discharge only for cause and providing for submission of disputes to arbitration."[1]

To be sure, the promulgation and implementation of a progressive discipline system governing employee conduct is within the permissible limits of managerial discretion. However, the exercise of this discretion under a labor agreement does not mean that the Company, by unilateral action, can arbitrarily impose an additional working condition, which constitutes an absolute cause for discharge.

While the definition of "just cause" varies from case to case, arbitrators utilize general tests for determining whether the Company had just cause to discharge an employee, including: Was the employee adequately warned of the consequences of his/her conduct? Did management investigate the matter before administering the discipline? Was the investigation performed in a fair and objective manner?

In the instant case, the Company violated the basic tenants of just cause for discharge. This Arbitrator is fully aware of the importance of absentee/tardiness policies. The Company undoubtedly will feel that if this discharge is set aside that any employee in the future may with impunity violate Company policies. However, the Arbitrator does not share the Company's anxiety in this regard since my conclusions are based solely upon the record in

---

[1] See John Morrell & Co., 9 LA 939

the instant case and obviously are not to be interpreted as a license to employees to violate any of the Company's policies including its absentee/tardiness policy.

By any standard of measurement, an absent employee is an economic loss to any employer, since management has the responsibility of securing a substitute for the absent employee. Time lost in finding and assigning a replacement and the possible deterioration in productivity are hazards to the successful operation of any organization. The frequency and extent of absenteeism are given priority concern by virtually all employers and a significant number of arbitrators. One method of control exercised by management is to discipline those employees who frequently absent themselves from work.

The axis of decision in the instant case rests upon the deprivation of the Grievant's due process rights and the Company's failure to meet the fundamental indicia of just cause, prior to invoking the discharge. If the Company would have adhered to the aforesaid principles, the decision in this case would be quite different. Therefore, the Grievant should consider his reinstatement as a reprieve since any future violation of Company policies, including its absentee/tardiness policy, will subject him to future discipline up to and including discharge.

## AWARD

After weighing the facts and evidence presented in the instant case, and reviewing the arguments by the parties in their respective post-hearing briefs, the grievance is hereby sustained. The Arbitrator orders that the Grievant be reinstated within five days from date of this Award and reimbursed for any lost wages at his regular rate less applicable payroll taxes, from the date of his discharge up to the date of his reinstatement.

Respectfully submitted,

John M. Felice
Arbitrator

DATED: September 15, 2016
Greensburg, PA